LIBERTY BANK OF MONTANA,
Plaintiff–Appellant,

v.

The TRAVELERS INDEMNITY
COMPANY OF AMERICA,
Defendant–Appellee.

No. 87–4240.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1988.

Decided March 29, 1989.

Gary M. Zadick, Ugrin, Alexander, Zadick & Slovak, P.C., Ward E. Taleff, Alexander & Baucus, Great Falls, Mont., for plaintiff-appellant.

Kenneth R. Dyrud, Church, Harris, Johnson & Williams, Great Falls, Mont., for defendant-appellee.

Before FLETCHER, BOOCHEVER and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Liberty Bank sued Travelers Indemnity (Travelers) for a declaration that Travelers had a duty to defend Liberty Bank against a counterclaim in its suit against Liberty Manufacturing to foreclose on a security interest. The district court granted Travelers' motion for summary judgment and denied Liberty Bank's motion for partial summary judgment. Liberty Bank appeals this order. We affirm.

## I

## FACTS

As security for a loan, Liberty Manufacturing granted Liberty Bank (Liberty) a security interest in all of its assets, inventory, equipment and accounts receivable. Upon default, Liberty threatened foreclosure unless Liberty Manufacturing brought the loans current. Liberty agreed to defer foreclosure if additional capital was injected into the company. A group of investors, "Private Lenders," were approached to make such investments. Liberty stated that if Private Lenders made the requested investment, the bank would subordinate its security position in the inventory and accounts receivable to the extent that they appreciated in value after September 1, 1981. Based upon this representation, Private Lenders invested in Liberty Manufacturing.

Liberty subsequently repudiated its subordination agreement, foreclosed its security interest, sold the collateral, and applied the proceeds to recover its own investment. During the foreclosure proceedings, Private Lenders brought a counterclaim against Liberty, alleging fraudulent misrepresentation, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing. In this underlying suit, the trial court eventually found in favor of the Private Lenders on the counterclaim.

Pursuant to its belief that the counterclaim in the underlying action triggered the duty to defend provision of their insurance policy, Liberty requested Travelers' assistance. After Travelers refused several tenders of defense, Liberty instituted this action in district court, seeking a declaration regarding the scope of coverage under the insurance policy. Cross-motions for summary judgment were filed. The district court found there was no duty to defend and granted Travelers' summary judgment motion.

## II

## DISCUSSION

We review grants of summary judgment de novo, viewing evidence in the light

most favorable to the nonmoving party to determine whether substantive law was correctly applied and whether there was any issue of material fact. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir.1988) (citing *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir. 1986)).

In this diversity action, Montana law controls the substantive rights and obligations of the parties. *St. Paul Fire & Marine Insurance Co. v. Weiner*, 606 F.2d 864, 867 (9th Cir.1979). Liberty cites various sections of Appelman, Insurance Law & Practice (1979 ed.), to support its argument that the duty to defend is determined by reference to the pleadings, discovery, and final issues declared ready for trial. While the scope of this rule has not been extensively defined in Montana, we may assume that the Montana Supreme Court, if faced with this issue, would hold that the duty to defend may be triggered by notification to the insured of facts asserted in the pleadings, discovery, or final issues declared ready for trial, giving rise to potential liability under the policy. Another way to state this rule is that the insurer's duty to defend arises when the claim against the insured sets forth facts representing a risk covered by the terms of the policy. *Lindsay Drilling & Contracting v. United States Fidelity & Guarantee Co.*, 208 Mont. 91, 93, 676 P.2d 203, 205 (1984). Under this framework, we must determine whether the district court erred in holding the claims asserted against Liberty did not trigger Travelers' duty to defend.

A. Damage to Reputation

The pertinent portion of the insurance policy which provided protection to Liberty Bank against claims alleging personal injury provides:

II. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE

(A) The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising ... and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent, ...

The Endorsement further provides:

'Personal Injury' means injury arising out of one or more of the following offenses committed during the policy period:

(1) false arrest, detention, imprisonment or malicious prosecution;

(2) wrongful entry or eviction or other invasion of the right or private occupancy;

(3) a publication or utterance

(a) of a libel or slander or other defamatory or disparaging material, or

(b) in violation of an individual's right of privacy.

Liberty argues the express language of the policy, "the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury," requires Travelers to defend any suit seeking damages on account of personal injury. Liberty contends a claim for damage to reputation was arguably asserted in pretrial discovery[1] and in the Final Pretrial Order,[2] Because Private

---

1. By virtue of an interrogatory response, Liberty submits a Private Lender asserted a claim that his credit reputation and standing with another bank was damaged. The interrogatory and answer read as follows:

*INTERROGATORY NO. 10:* State the amount of economic damages claimed by each private lender.

*ANSWER:* Dewayne Swanson.

I had to move to Idaho and find another job. The bank brought pressure on me to pay my loan to them, then delinquent, I had to sell my farm. My credibility has been damaged. Martin Olson wrote First United Bank in Sidney, Montana without my knowledge pertaining to this loan. My credit rating has fallen considerably.

2. Damages sought against the bank were set forth in the Final Pretrial Order as:

"The Private Lenders pray for compensatory damages in the amount of $350,000. The Private Lenders specifically pray for all consequential damages proximately caused by the bank's tortious conduct, including economic damages associated with the bank's unlawful conduct and including damages for emotional distress, financial duress, embarrassment, and injury to reputation."

Lenders were seeking damages for personal injury, Liberty argues the duty to defend, which may be determined from pretrial proceedings, was triggered. Accordingly, we must determine whether the interrogatory response or the Final Pretrial Order contain a claim for personal injury which would trigger Traveler's duty to defend. We consider these in reverse order.

■ Although the district court recognized the theoretical existence of claims for damage to reputation, the court concluded that the "claim" in this case was merely "consequential" and therefore did not trigger a duty to defend:

> "The allegations set forth by the Private Lenders in the underlying action did not include a claim for libel, slander, or defamation. Rather, the Private Lenders merely alleged damaged reputation as an item of consequential damages. In the court's opinion, such a claim for consequential damages was insufficient to trigger a duty to defend on Traveler's part."

Liberty submits this ruling was error for two reasons. First, after recognizing that consequential damages for harmed reputation were alleged, the court failed to consider the broad policy language which imposes a duty upon Travelers to defend all claims seeking damages for the publication or utterance of any defamatory or derogatory material. Second, the court failed to cite any authority for its conclusion that consequential damages are excluded from coverage. Even if Liberty correctly argues the order could have "triggered" a duty to defend, Travelers was never given notice of this order as it was not filed until the day of trial. Accordingly, without deciding whether the request for consequential dam-

ages for harm to reputation asserted in the Final Pretrial Order is within the policy's coverage, we find the request for consequential damages did not trigger the duty to defend under the personal injury provision.

■ We next consider whether a claim for damage to reputation was asserted by virtue of the interrogatory answer. The question we must answer is whether the interrogatory answer could, arguably, be read to state a cause of action—based on Mr. Olson's letter to First United Bank—for "a publication or utterance (a) of a libel or slander or other defamatory or disparaging material...." We find the district court's rejection of "personal injury" coverage is supported by a recent decision of another division of the Montana district court. In *Aetna Casualty and Surety Co. v. First Security Bank of Bozeman*, 662 F.Supp. 1126 (D.Mont.1987), a discharged bank employee alleged claims for breach of the implied covenant of good faith and fair dealing attendant contracts of employment and for wrongful termination. She sought punitive damages and damages for lost wages, diminished earning capacity, harm to her reputation, and emotional distress. Aetna sought a declaration that the liability policy issued to the bank did not provide coverage for damages sought by the discharged bank employee.[3] On Motion for Reconsideration, the bank argued that under the personal injury endorsement, the liability policy would provide coverage for the claims asserted against it.[4]

Aetna contended that because there were no allegations of libel, slander, defamation or disparagement in the complaint, there was no coverage under the policy. The

**3.** The insuring clause for personal injury provided:

"II. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE.

(1) The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *personal injury* ..., and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent."

*Aetna*, 662 F.Supp. at 1130–31 (emphasis in original).

**4.** The endorsement stated, in relevant part:

"'Personal injury' means injury arising out of one or more of the following offenses committed during the policy period:

. . . . .

(3) a publication or utterance (a) of a libel or slander or other defamatory or disparaging material...."

*Id.* at 1131.

bank argued that the employee's allegations that Steven Wheeler told her she was fired could constitute defamatory or disparaging material; therefore, the language of the endorsement was ambiguous. *Id.* at 1131.

Because Montana courts have not squarely addressed the issue, the district court judge in *Aetna,* based upon Montana case authority, took an approach he believed the Montana Supreme Court would adopt. *Id.* at 1131–32. The court held that the "personal injury" endorsement "applied only to claims actually arising out of the enumerated torts." *Id.* (citing *American and Foreign Insurance Co. v. Church Schools, Diocese of Virginia,* 645 F.Supp. 628 (E.D.Va.1986)). Additionally, the court held the employee's claims against the insured were for injuries arising out of the torts of bad faith and wrongful termination, and "not out of the defamation torts set forth in the 'broad form comprehensive general liability endorsement.'" *Id.* at 1132. Moreover, the court observed that the employee's complaint made no allegation that the insured's statements were false, "an essential element of the defamation torts." *Id.* (citing *Griffin v. Opinion Publishing Co.,* 114 Mont. 502, 507, 138 P.2d 580 (1943)). The court concluded by finding no coverage because the complaint in the underlying action did not allege any cause of action for defamation which is necessary before the "personal injury" endorsement can be applied.

We adopt the reasoning and analysis set forth in *Aetna.* The pleadings of the Private Lenders make no reference to any of the elements of a claim for defamation or disparagement, either expressly or by incorporating extraneous materials. Rather, claims of fraudulent misrepresentation, negligent misrepresentation and breach of the implied covenant of good faith and fair dealing were alleged. Although the interrogatory answer sets forth two of the elements of a defamation action: a communication to a third person, and injury to reputation, nowhere does it indicate, even by inference, that the letter contained a false-

hood. Because falsehood is an element of defamation, facts which set forth some elements of defamation but not falsehood, when construed in light of a complaint which does not include a cause of action for defamation, do not trigger a duty to defend. *Id.* Just as in *Aetna,* we find that no coverage is provided by the policy.

**B. Loss of Use of Tangible Property**

■ The subject policy defines "property damage" as:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of the use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The district court found that the Private Lenders' counterclaim did not allege physical injury to or destruction of tangible property. Rather, the court determined the Private Lenders alleged they were "denied their right to claim a security interest" against the increase in the value of the inventory. Accordingly, the court found the counterclaim sought compensatory damages for economic loss stemming from the loss of the subordination in security promised by Liberty.

The district court also concluded that the claims set forth in the counterclaim did not involve tangible property, but rather the loss of the right to have the collateral sold and applied to their claims. Thus, there was no loss of "use" of collateral in the ordinary sense of the word. The court further ruled that even conceding there was a loss of use of tangible property, the counterclaim failed to allege the loss was caused by an "occurrence," as defined in the policy.[5] Accordingly, the court concluded that any sums Liberty might have been obligated to pay as a result of the counterclaim would not be a result of "property damage," and held the property

---

5. The policy defines "occurrence" as:
   'Occurrence' means an accident, including continuous or repeated exposure to condi-

tions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

damage claims did not trigger a duty to defend.

The instant case falls into the category of cases where it is generally accepted that economic losses, such as lost profit or good will, are not property damage within policy coverage. The Montana Supreme Court has addressed the issue of coverage for "property damage," and has determined that this definition means what it says. If there is damage to tangible property, there may be coverage. If not, there is no coverage. *See Lindsay Drilling v. U.S. Fidelity & Guar.*, 208 Mont. 91, 676 P.2d 203, 205–6 (1984) (coverage found because of alleged physical tampering with core samples)); and *Safeco Insurance Co. v. Munroe, et al.*, 165 Mont. 185, 527 P.2d 64, 68 (1974) (physical damage to a wheat crop justified coverage)).

Liberty argues the district court erred in following this approach to this case. First, Liberty contends that the economic loss was merely the monetary measure of the value of the loss of use of the tangible property. This concept was recognized by this court in *Lassen Canyon Nursery v. Royal Ins. Co. of America*, 720 F.2d 1016, 1018 (9th Cir.1983). *Lassen* is distinguishable, however, because it recognized an intangible economic loss, such as the diminution in value of fixed assets due to loss of use, may be covered if it provides a measure of damage to tangible property. *Id.* In the instant case, there was no diminution in value; rather Private Lenders were denied their right to claim a security interest. Second, Liberty submits that Private Lenders alleged a loss of use of tangible property since they were unable to take it and convert it to their own benefit. Money damages were requested because of their inability to use and liquidate the collateral.

Liberty's argument that an intangible economic loss may be covered if it provides a measure of damage to tangible property has no merit under the circumstances of this case. Here, there was no damage to the tangible property. As stated by the district court, "it is beyond dispute that the underlying action arose exclusively from a commercial transaction and involved a priority dispute between creditors as to cer-

tain collateral." Because we find no loss of use of property was alleged, we need not consider Liberty's argument that the district court erred in finding no "occurrence" was pled.

The district court is

AFFIRMED.