**BANKWEST, Plaintiff,**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant.**

Civ. A. No. 92–2004–GTV.

United States District Court, D. Kansas.

Aug. 11, 1993.

Jeffrey S. Nelson, William R. Sampson, Shook, Hardy & Bacon, Overland Park, KS, for plaintiff.

John K. Sherk, Carol A. Zuschek, Bruce B. Waugh, Gilliland & Hayes, P.A., Kansas City, MO, for defendant.

### *MEMORANDUM AND ORDER*

VAN BEBBER, District Judge.

The issue in this case is whether plaintiff BANKWEST was entitled to coverage under two policies of liability insurance issued by defendant Fidelity and Deposit Company of Maryland such that defendant was required to provide a defense for plaintiff when it was sued by two of its borrowers. Plaintiff had demanded that defendant provide it with a defense to that suit pursuant to the terms of the insurance. Defendant denied coverage. Plaintiff then filed this breach of contract

action against defendant seeking damages, prejudgment interest on those damages, and the costs of this action, including its reasonable attorneys' fees.

The case is currently before the court on the parties' counter-motions for summary judgment. Defendant moves the court (Doc. 51) for summary judgment pursuant to Fed. R.Civ.P. 56(b). Plaintiff moves the court (Doc. 60) for summary judgment pursuant to Fed.R.Civ.P. 56(a). Defendant's motion is sustained and plaintiff's motion is overruled.

## I. SUMMARY JUDGMENT STANDARDS

■ A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the court should interpret the rule in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's proper inquiry is "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by pointing out to the district court, that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553. Once the moving party has properly supported its motion for summary judg-

ment, the burden of production shifts to the nonmoving party. "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden that the parties will face at trial. *Id.* at 254, 106 S.Ct. at 2513.

## II. FACTUAL BACKGROUND

Plaintiff is a Kansas corporation and has its principal place of business located in Kansas. Plaintiff, formerly known as The Goodland State Bank & Trust Company, is a bank. Defendant is a Maryland corporation and has its principal place of business located in Maryland. Defendant is in the business of insurance. At the times relevant to this case, plaintiff held two policies of liability insurance issued by defendant.

### A. THE HOUSE LAWSUIT

On September 14, 1987, Harlan Dale House and Cora House filed suit against plaintiff in the District Court of Sherman County, Kansas. The Houses' Petition asserted the following allegations:

The Houses were long-time customers of The Goodland State Bank & Trust. As of early 1985, the Houses owned a farming operation in western Kansas and a condominium in Vail, Colorado. The Vail condominium was encumbered by a First and Second Deed of Trust in favor of the First National Bank of Windsor, Colorado, and a Third Deed of Trust in favor of the First Bank of Vail, Colorado. The total debt secured by the three deeds of trust was $240,000.00.

In March, 1985, the Houses and plaintiff reached an oral agreement whereby plaintiff would grant the Houses a line of credit in the amount of $800,000.00. As security for the line of credit, the Houses granted plaintiff a Fourth Deed of Trust on the Vail Condomini-

um in the amount of $1,000,000.00. As a condition of being granted the Fourth Deed of Trust, plaintiff agreed not to impair or interfere with the Houses' existing lines of credit with the First National Bank of Windsor and the First Bank of Vail.

Approximately two months later, plaintiff sent "letters of estoppel" to the First National Bank of Windsor and the First Bank of Vail. The letters notified those banks that they were "estopped" from making any future advances to the Houses. Moreover, plaintiff ceased honoring the line of credit it had granted to the Houses. From October, 1985, until April, 1986, plaintiff refused to advance the Houses any money. As a result of plaintiff's actions, the Houses' farming operations were financially disrupted.

In May, 1986, the Houses and plaintiff "negotiated a renewal of certain loan obligations." Plaintiff agreed, as part of the transaction, to reopen the previously established line of credit and again promised not to interfere with the Houses' existing lines of credit at the First National Bank of Windsor and the First Bank of Vail.

Thereafter, the First National Bank of Windsor and the First National Bank of Vail contacted plaintiff in an attempt to resolve the disturbance caused by the "letters of estoppel." Those banks attempted to resolve the situation in order that they "could advance additional funds" to the Houses. The First National Bank of Windsor eventually sent a Subordination Agreement to plaintiff. The purpose of the Subordination Agreement was to subordinate plaintiff's deed of trust to those of the First National Bank of Windsor "so that the existing loan [with the First National Bank of Windsor] could be renewed and additional funds could be advanced" to the Houses. Plaintiff refused to execute the Subordination Agreement.

As a result of plaintiff's refusal, the First National Bank of Windsor refused to renew the Houses' existing loan and closed the line of credit. The Houses, as a result, faced a severe financial crisis. On August 4, 1986, the First National Bank of Windsor notified the Houses that it "would have to institute foreclosure of its Deed[s] of Trust." A copy of that letter was sent to plaintiff. The

Houses then requested that plaintiff provide assurance to the First National Bank of Windsor that it would not interfere with the Houses' line of credit. Plaintiff ignored the Houses' request.

The First National Bank of Windsor instituted foreclosure proceedings. In order to avoid the impending Trustee's Sale of the Vail condominium and in order to protect their farming assets, the Houses' were compelled to file for bankruptcy in the United States District Court for the District of Kansas.

As noted above, on September 14, 1987, the Houses filed suit against plaintiff. Their Petition asserted the allegations summarized above and was cast in three counts. In Count I, the Houses alleged that plaintiff had breached their contract by refusing to extend the full amount of the $800,000.00 line of credit to them and by interfering with their other existing lines of credit. In Count II, the Houses alleged that plaintiff had tortiously interfered with their contracts, or business relations, by sending the "letters of estoppel" to the Colorado banks. In Count III, the Houses alleged that, because plaintiff had obtained the Fourth Deed of Trust under false pretenses, it had committed fraud.

The Pretrial Order in that action, filed July 26, 1990, discloses that the Houses sought damages in excess of $8,000,000.00. As itemized in the Pretrial Order, the Houses sought $5,000,000.00 for "[m]ental anguish[,] mental distress, humiliation and loss of reputation. . . ." It is undisputed that the Houses' alleged loss of reputation damages flowed from the fact that they were compelled to file for bankruptcy after the First National Bank of Windsor instituted foreclosure proceedings on its deeds of trust.

### B. THE POLICIES OF INSURANCE

At the time of the events giving rise to the *House* lawsuit and at the time that the lawsuit was filed, plaintiff had liability insurance through defendant. Two policies issued by defendant to plaintiff are relevant to this case: (1) Special Multi–Peril Policy for Financial Institutions (SMP), Policy Number SMP 690 60 88; and (2) Umbrella Excess

Liability Policy (UEL), Policy Number UEL 69 44 809.

The SMP provided for three types of coverage—bodily injury, property damage, and personal injury. It is undisputed that only the third type of coverage is relevant to the present case. The personal injury language of the SMP, in relevant part, provides:

## PERSONAL INJURY LIABILITY INSURANCE

### I. Coverage Agreement

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury . . . sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named insured's business:

A. false arrest, detention, or imprisonment, or malicious prosecution;

B. the publication or utterance of a libel or slander or of other defamatory or disparaging material . . .

. . . .

According to the SMP, if plaintiff committed one of the "covered offenses," such as false arrest, then defendant owed plaintiff a duty to defend and, in the event of judgment against plaintiff or settlement, a duty to indemnify.

The UEL provided excess coverage for the SMP and also provided "drop down" coverage if coverage was not available under the SMP. The UEL defined personal injury as follows:

"**Personal Injury**" means any of the following which occurs during the policy period:

(a) bodily injury, sickness, disease, disability or shock, including death arising therefrom, and, if arising out of the foregoing, mental anguish and mental injury, including medical or nursing care and loss of services resulting from any of the aforementioned;

(b) false arrest, false imprisonment, wrongful detention, malicious prosecution, including humiliation arising out of the aforementioned;

(c) the publication or utterance of a libel or slander of other defamatory material, including disparaging statements concerning the value, quality or use of real or personal property, or a publication or utterance in violation of rights of privacy, except when any of the foregoing of this part (c) arises out of the **Insured's** advertising activities;

(d) wrongful entry or eviction, or other invasion of the right of private occupancy;

(e) assault and battery not committed by or at the direction of the **Insured,** unless committed for the purpose of protecting persons or property.

Similar to the SMP, to be covered under subsections (b)–(e), the UEL required that the insured must have committed the "covered offense."

## C. THE EVENTS GIVING RISE TO THIS ACTION

On September 21, 1987, one week after the Houses filed their action, plaintiff sent a letter to its insurance agent and enclosed a copy of the Houses' Petition. On September 23, 1987, plaintiff's counsel sent a letter to plaintiff's insurance agent and requested that, "pursuant to the terms of the policy[,] the [insurance] company defend this case and provide coverage." On October 5, 1987, defendant responded, acknowledging receipt of the Houses' Petition and advising that the question of coverage had been referred to its home office for review. By letter dated May 31, 1988, defendant denied coverage.

On August 19, 1988, the Houses' counsel wrote plaintiff and itemized their claims for damages. On April 27, 1989, counsel for plaintiff notified defendant that the Houses were seeking damages for loss of reputation. He also indicated that it was his opinion, based on the Houses' request for damages, that the Houses' would inevitably amend their Petition to include a claim for defamation—a "covered offense" under the policies. Over the next several months plaintiff's counsel reiterated his opinion and requested that defendant defend the case and provide coverage. On September 1, 1989, defendant re-

sponded to those requests and again denied coverage.

On July 26, 1990, as noted above, the Pretrial Order was entered in the *House* lawsuit. Also as noted above, the Houses sought $5,000,000.00 in damages for "[m]ental anguish[,] mental distress, humiliation, and loss of reputation...." Trial was set in the case for September 11, 1990. Before the case reached trial the Houses and plaintiff reached a settlement agreement. On September 17, 1990, a Journal Entry of Dismissal was entered in the case.

On January 3, 1992, plaintiff filed the present action alleging that by denying coverage under the SMP and UEL policies of insurance—*i.e.,* by refusing to defend the *House* lawsuit or indemnify plaintiff for the settlement—defendant breached the insurance contract. As damages, plaintiff seeks to recover the expenses of defending the *House* lawsuit, prejudgment interest on those expenses, the amount of the settlement, prejudgment interest on that amount, and the costs of this action, including its attorneys' fees.

### III. DISCUSSION

In its motion for summary judgment, defendant contends that the uncontroverted facts in this case disclose that it is entitled to judgment as a matter of law on plaintiff's breach of contract claims. Defendant contends that because the Houses' Petition alleged no covered injuries nor any covered offenses, it properly denied coverage in this case. On that basis, it contends that it did not breach the contract as a matter of law and is entitled to summary judgment in this case.

In its motion for summary judgment, plaintiff contends that the uncontroverted facts in this case disclose that it is entitled to judgment as a matter of law on its claims. Plaintiff contends that the relevant language of the SMP and UEL policies are susceptible of more than one meaning and are ambiguous. Plaintiff contends, therefore, that the policies must be construed in its favor. Plaintiff contends that such a construction discloses that defendant owed it a duty to defend and a duty to indemnify and that, by failing to provide either, defendant breached the contract as a matter of law. In the alternative, plaintiff argues that, because defendant delayed in responding to its requests for coverage, defendant is estopped from denying coverage under the SMP and UEL policies. On those alternative grounds, plaintiff contends that it is entitled to summary judgment, or that genuine issues of material exist which preclude entry of summary judgment in favor of defendant.

The court concludes that the uncontroverted facts in the case disclose that defendant did not breach the insurance contract at issue. While the parties spend considerable time and effort arguing whether or not the language of the policies is ambiguous, the court is of the opinion that that issue is not crucial to the disposition of this case. Consequently, the court will assume for the purposes of this order that the policies are ambiguous and will construe them in favor of plaintiff. *See, e.g., Wing Mah v. United States Fire Ins. Co.,* 218 Kan. 583, 586, 545 P.2d 366 (1976).

Even construing the policy in favor of plaintiff, the court concludes that the *House* action, basically a breach of contract action, is not covered by the SMP and UEL policies of insurance. The SMP policy provides three separate types of liability coverage—bodily injury, property damage, and personal injury. In cases of bodily injury and property damage, the type of injury that the claimant suffers triggers coverage. In cases of personal injury, the action of the insured triggers coverage. Plaintiff concedes that only the personal injury coverage is at issue in this case. As noted above, the SMP policy, in relevant part, provides coverage for "false arrest, detention, or imprisonment, or malicious prosecution" and *"the publication or utterance of* a libel or slander or of other defamatory or *disparaging material...."* The UEL policy, while more narrowly drawn than the SMP policy, provides for substantially similar coverage.

Plaintiff concedes that the *House* lawsuit did not involve false arrest, false detention or imprisonment, malicious prosecution, libel, slander, or defamation. Thus, the court

must focus its attention on the above-emphasized language: "the publication or utterance of . . . disparaging material." Before a duty to defend would attach under the insurance contracts plaintiff must have committed an offense or act that amounted to the publication or utterance of disparaging material for which the Houses brought a cause of action.

Plaintiff contends that because the Houses sought damages for loss of reputation they necessarily asserted a cause of action against plaintiff for the publication or utterance of disparaging material. The court concludes that plaintiff reads too much into the Houses' claim against it. The claim for loss of reputation, as set forth in the pretrial order and as testified to by the Houses' attorney, was merely an element of damages flowing from the fact that the Houses were compelled to file for bankruptcy. The Houses were compelled to file for bankruptcy because the First National Bank of Windsor instituted foreclosure proceedings on their deeds of trust. While those foreclosure proceedings may have been precipitated by the "letters of estoppel," it cannot be argued that those letters were disparaging to the Houses. Even construing the terms "disparaging material" in favor of plaintiff, the court is constrained to conclude that the letters, which merely stated that the Colorado banks were estopped from advancing the Houses any additional money, were not, by any stretch of the meaning, disparaging.

Because the Houses brought no cause of action against plaintiff for the commission of an SMP or UEL "covered offense," the court concludes that defendant properly denied coverage to plaintiff. Accordingly, the court concludes that defendant is entitled to judgment as a matter of law on plaintiff's claims that it breached the insurance contract in question. For that reason, defendant's motion for summary judgment is sustained and plaintiff's motion for summary judgment is overruled.

Plaintiff advances an additional argument in support of its motion and in opposition to defendant's motion. The gravamen of its argument is that because defendant delayed so long in denying coverage under the policies of insurance that it is estopped from denying coverage. The court finds no merit to this contention. In Kansas, estoppel may "forestall the forfeiture" of an insurance policy, but it cannot expand its coverage. *Western Food Products Co., Inc. v. United States Fire Ins. Co.*, 10 Kan.App.2d 375, 381, 699 P.2d 579 (1985). Here, the court has concluded that there was no coverage of the *House* lawsuit under the policies at issue in this case. By arguing estoppel, plaintiff attempts to "expand coverage" under the policies. That is exactly what *Western Food Products Co., Inc.* prohibits. The court rejects plaintiff's estoppel contention accordingly.

IT IS, THEREFORE, BY THE COURT ORDERED that the motion (Doc. 51) of defendant Fidelity and Deposit Company of Maryland for summary judgment is sustained.

IT IS FURTHER ORDERED that the motion (Doc. 60) of plaintiff BANKWEST for summary judgment is denied. The case is hereby closed.

**IT IS SO ORDERED.**