**BANKWEST, a Kansas corporation, Plaintiff–Appellant,**

v.

**FIDELITY & DEPOSIT COMPANY OF MARYLAND, a Maryland corporation, Defendant–Appellee.**

No. 93–3282.

United States Court of Appeals, Tenth Circuit.

Aug. 21, 1995.

Rehearing Denied Sept. 22, 1995.

---

Jeffrey S. Nelson (William R. Sampson with him on the brief), Shook, Hardy & Bacon, Overland Park, KS for plaintiff-appellant.

Bruce B. Waugh (John K. Sherk and Carol Zuschek Smith with him on the brief), Gilliland & Hays, Kansas City, MO for defendant-appellee.

Before MOORE, BARRETT, and HENRY, Circuit Judges.

HENRY, Circuit Judge.

Plaintiff-appellant Bankwest appeals the district court's order granting summary judgment to defendant-appellee Fidelity Deposit Company of Maryland (Fidelity). The district court ruled that Fidelity had no duty to defend or indemnify Bankwest in conjunction with a lawsuit filed by two customers who alleged Bankwest had damaged their reputation. *See Bankwest v. Fidelity & Deposit Co.*, 832 F.Supp. 313 (D.Kan.1993) We exercise jurisdiction under 28 U.S.C. § 1291, reverse the decision of the district court, and remand for further proceedings.

## I. BACKGROUND

In 1987, Harlan Dale House and Cora House sued Bankwest (then known as the Goodland State Bank & Trust Company) in Kansas state court alleging that, in 1985, Bankwest orally agreed to extend them an $800,000 line of credit. The Houses alleged that in exchange for that line of credit they agreed to grant Bankwest a $1,000,000 "fourth Deed of Trust" on real estate they owned in Vail, Colorado. Applt's App. at 237. According to the Houses, they had previously granted three deeds of trust on the same Colorado property: a $40,000 first deed of trust to the First National Bank of Windsor, a $100,000 second deed of trust to the same bank, and a $100,000 third deed of trust to the First Bank of Vail. As part of the alleged oral contract, Bankwest agreed not to interfere with the Houses' existing lines of credit with these other banks.

The Houses' petition further alleged that, approximately sixty days after negotiation of the oral agreement, Bankwest's president sent letters to the Windsor and Vail banks stating that both banks were "estopped from making any future advancements" to the Houses. *Id.* at 238. The Houses also maintained that, from October 1985 until April 1986, Bankwest refused to honor its promise to extend them the $800,000 line of credit.

According to the Houses, in May 1986, Bankwest "renewed its prior agreement to extend a full [$800,000] line of credit to plaintiffs and not to impair or interfere with plaintiffs' existing lines of credit with First National Bank of Windsor and First Bank of Vail, as consideration for plaintiffs' pledge of the fourth Deed of Trust." *Id.* at 239. Subsequently, the Windsor bank sent a proposed agreement to Bankwest's president acknowledging the subordination of Bankwest's fourth deed of trust to the prior deeds of trust. Bankwest's president refused to sign the agreement. As a result, the Houses alleged, the Windsor bank initiated foreclosure proceedings against the Vail property, and they were compelled to file bankruptcy in order to avoid a forced sale.

The Houses' petition asserted three causes of action: (1) a claim that Bankwest breached the agreement to extend the $800,000 line of credit and not to interfere with the Houses' existing lines of credit with other banks; (2) a claim that Bankwest's actions as to the Houses' lines of credit with other banks "were intentional and with malice, and amounted to an interference with the business relationship and interference with contract," *id.* at 241; and (3) a claim that Bankwest obtained the fourth deed of trust by false pretenses in that Bankwest had no intention of honoring the conditions upon which the Houses had tendered it. The Houses sought compensatory and punitive damages, as well as a declaratory judgment that the fourth deed of trust was void.

At the time of the filing of the Houses' lawsuit, Fidelity had issued several liability insurance policies to Bankwest. Only one of these policies is relevant to this appeal: Fidelity's Special Multi–Peril Policy for Financial Institutions (the multi-peril policy).[1] The multi-peril policy provided coverage for bodily injury, property damage, and personal injury. The personal injury section stated, in part:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person or organization and *arising out of one or more of the following offenses* committed in the conduct of the named insured's business:
>
> . . . .
>
> B. *the publication or utterance of a libel or slander or of other defamatory or disparaging material* . . .;
>
> . . . .
>
> if such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

*Id.* at 292–93 (emphasis added).

Shortly after receiving the Houses' petition, Bankwest's attorney sent a letter to Fidelity's insurance agent requesting Fidelity to defend the action. On October 5, 1987, Fidelity acknowledged receipt of the Houses' petition. However, in a letter dated May 31, 1988, Fidelity stated to Bankwest that it would not defend the lawsuit. Bankwest made several subsequent requests for a defense, but Fidelity refused. In September 1990, the Houses and Bankwest reached a settlement. The Houses received $400,000 in cash from Bankwest and forgiveness of a debt in the amount of $53,993.49. In turn, the Houses dismissed the suit against Bankwest.

In June 1992, Bankwest filed this diversity action, alleging that Fidelity had breached the insurance contract by refusing to defend the Houses' lawsuit and indemnify it for the settlement. Bankwest sought to recover the costs incurred in defending the Houses' suit, the amount paid to the Houses under the terms of the settlement, attorneys' fees, costs, and prejudgment interest.

Both parties filed motions for summary judgment. Bankwest argued that the multi-peril policy's reference to "the publication or utterance of a libel or slander or of other defamatory or disparaging material" was broad enough to include the Houses' lawsuit because the Houses alleged that they had been disparaged by Bankwest's letters to the Colorado banks and sought damages for loss of reputation. Fidelity responded that the policy covered only the specific claims listed and that, because none of the claims in the Houses' lawsuit were listed in the multi-peril policy, it had no duty to defend or indemnify Bankwest.

In granting summary judgment to Fidelity, the district court reasoned that the House lawsuit did not involve the publication of defamatory or disparaging material. The court stated that the only possible defamatory or disparaging publications were the letters that Bankwest sent to the Colorado banks. However, it concluded:

> While those foreclosure proceedings may have been precipitated by the "letters of estoppel," it cannot be argued that those letters were disparaging to the Houses. Even construing the terms "disparaging material" in favor of plaintiff, the court is constrained to conclude that the letters, which merely stated that the Colorado

---

1. Fidelity had also issued to Bankwest an Umbrella Excess Liability Policy. However, Bankwest maintains on appeal that the multi-peril policy is the only one at issue. *See* Applt's Brief at 24.

banks were estopped from advancing the Houses any additional money, were not, by any stretch of the meaning, disparaging. *Bankwest*, 832 F.Supp. at 318. The court also rejected Bankwest's argument that Fidelity's delay in responding to Bankwest's requests for a defense estopped it from asserting that the policies did not cover the lawsuit.

On appeal, Bankwest renews its argument that the reference in Fidelity's multi-peril policy to "the publication or utterance of a libel or slander or of other defamatory or disparaging material" encompasses the Houses' claim for intentional interference with contract and business relations. As a result, Bankwest maintains, Fidelity had a duty to defend the Houses' lawsuit and to indemnify it on the Houses' intentional interference claim. Bankwest also argues that Fidelity should be estopped from denying coverage.

## II. DISCUSSION

We review the district court's grant of summary judgment de novo, applying the same standard as the district court under Fed.R.Civ.P. 56(c). *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). "Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir.1991). We must review the record in the light most favorable to the nonmoving party. *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Additionally, in this diversity case we apply Kansas law. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "The obligation of responsible appellate review and the principles of a cooperative judicial federalism underlying *Erie* require that courts of appeals review the state-law determinations of district courts de novo." *Salve Regina College v. Russell*, 499 U.S. 225, 239, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991).

Under Kansas law, an insurer's duty to defend arises "whenever there is a 'poten-

tial of liability' under the policy." *State Farm Fire & Casualty Co. v. Finney*, 244 Kan. 545, 770 P.2d 460, 466 (1989) (quoting *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403, 407 (1973)). The insurer must determine whether there is a potential of liability under the policy by examining the allegations of the complaint as well as any additional facts that have been brought to its attention. *Id.; see also American Motorists Ins. Co. v. General Host Corp.*, 946 F.2d 1482, 1486 (10th Cir.) (discussing duty to defend), *reh'g granted and opinion modified*, 946 F.2d 1489 (10th Cir.1991). The relevant determination for the insurer is whether there is "a possibility that under the facts of the case the insured may be found legally obligated to pay damages because of an occurrence that was an insured risk; that is, a possibility that there may be a duty to indemnify arising out of the facts of the case." *American Fidelity Ins. Co. v. Employers Mut. Casualty Co.*, 3 Kan. App.2d 245, 593 P.2d 14, 19–20 (1979).

The duty to indemnify is narrower than the duty to defend. *American Motorists*, 946 F.2d at 1488–89. Although the duty to defend is determined by the allegations of the underlying complaint and by facts discoverable to the insurer, the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means (*e.g.*, summary judgment or settlement). *Id.* (citing *Travelers Ins. Co. v. Waltham Indus. Lab. Corp.*, 883 F.2d 1092, 1099 (1st Cir.1989)).

With regard to the insurer's duty to defend and to indemnify, when "the terms ... are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail." *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 732 P.2d 741, 746 (1987). The fact that judicial opinions have interpreted identical policy provisions differently may demonstrate ambiguity. *See Alliance Life Ins. Co. v. Ulysses Volunteer Fireman's Relief Ass'n*, 215 Kan. 937, 529 P.2d 171, 180 (1974). However, "[w]hen an insurance contract is not ambiguous, the court may not make another contract for the

parties. Its function is to enforce the contract as made." *Patrons,* 732 P.2d at 746.

We have discovered no Kansas or Tenth Circuit decisions construing the disputed phrase in the multi-peril policy. However, several other courts have construed the identical phrase, or a similar one, in analogous circumstances. For example, in *Liberty Bank v. Travelers Indem. Co. of America,* 870 F.2d 1504, 1506 (9th Cir.1989), the Ninth Circuit held that a liability insurance policy providing coverage for "a publication or utterance ... of a libel or slander or other defamatory or disparaging material" did not require the insurer to defend claims for fraudulent misrepresentation, negligent misrepresentation, or breach of an implied covenant of good faith and fair dealing. Although the plaintiff in the underlying action had alleged that employees of the insured bank had written to other banks about the plaintiff's delinquent loan payments, the Ninth Circuit noted that the plaintiff had not alleged that the bank employees' statements were false. "Because falsehood is an element of defamation," the court reasoned, "facts which set forth some element of defamation but not falsehood, when construed in light of a complaint which does not include a cause of action for defamation, do not trigger a duty to defend." *Id.* at 1508; *see also Aetna Casualty & Sur. Co. v. First Sec. Bank,* 662 F.Supp. 1126, 1132 (D.Mont.1987) (holding that the insurer was not required to defend claims for breach of an implied covenant of good faith and fair dealing and for wrongful termination of employment because underlying complaint did not allege that the defendant made a false statement to a third party); *Western Commerce Bank v. Reliance Ins. Co.,* 105 N.M. 346, 732 P.2d 873, 876 (1987) (holding that identical policy language did not require insurer to defend counterclaim for interference with contractual relations because "[t]here were no allegations that the Bank published or uttered anything involving [the plaintiff's] reputation or disparaging [the plaintiff's] property" and because the counterclaim did not necessarily imply such allegations); *American & Foreign Ins. Co. v. Church Sch.,* 645 F.Supp. 628, 634 (E.D.Va.1986) (holding that identical policy language did not require insurer to defend claims for assault, battery, and intentional and negligent infliction of emotional distress in spite of alleged damage to reputation and noting that "coverage must be determined based on the claims under which relief is sought").

In contrast, several other courts have construed the identical or similar policy language more broadly. In *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.,* 406 Mass. 7, 545 N.E.2d 1156 (1989), the court held that a liability insurance policy containing the same personal injury provision as Fidelity's multi-peril policy required the insurer to defend a breach of contract claim in which the actress Vanessa Redgrave alleged that the Boston Symphony's cancellation of a performance with her had "led others to refrain from hiring" her. *Id.,* 545 N.E.2d at 1157. The court reasoned that the essence of Ms. Redgrave's claims was that the Boston Symphony "somehow spoke slightingly of her and damaged her reputation." *Id.,* 545 N.E.2d at 1159. Because "disparage" means, among other things, " 'to lower in rank and estimation by actions or words,' " the court said, the policy could reasonably be construed to cover Ms. Redgrave's claim. *Id.* (quoting *Webster's New International Dictionary of the English Language* 750 (2d ed. 1959)); *see also City of Cape May v. St. Paul Fire & Marine Ins. Co.,* 216 N.J.Super. 697, 524 A.2d 882, 883–86 (Ct.App.Div.1987) (policy covering "the publication or utterance of a libel or slander or other defamatory or disparaging material" required insurer to defend claim for malicious interference with business interests in which plaintiff alleged that insured's false statements damaged his reputation); *CNA Casualty v. Seaboard Sur. Co.,* 176 Cal. App.3d 598, 222 Cal.Rptr. 276, 281 (1986) (holding that policy covering libel, slander, and the publication or utterance of other defamatory or disparaging material required insurer to defend antitrust claim alleging that the insured misrepresented property rights in order to disrupt plaintiff's business relationships).

■ Bankwest maintains that the latter line of cases establishes that the phrase "the publication or utterance of a libel or slander

or of other defamatory or disparaging material" can be reasonably read to encompass claims other than libel or slander that involve the publication of "defamatory or disparaging material." Bankwest's argument is supported by the language of the policy. By listing the "offense" of "the publication or utterance of . . . defamatory or disparaging material" separately, the multi-peril policy appears to cover more than just libel and slander claims. *See Boston Symphony Orchestra*, 545 N.E.2d at 1159.

In fact, there are several torts distinct from libel or slander that one might reasonably describe as the publication or utterance of defamatory or disparaging material. One such tort is " 'called by various names such as "disparagement of property," "slander of goods," "commercial disparagement," and "trade libel." ' " *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir.1991) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 128, at 963–64 (5th ed. 1984)). The tort is "now generally referred to as 'injurious falsehood.' " *Id.* The *Restatement (Second) of Torts* § 623A (1979) describes this tort as follows:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> (a) he intends for publication of the statement to result in harm to the interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
>
> (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

The tort has been broadly interpreted to include the publication of "other falsehoods harmful to any legal interest of another that has pecuniary value." *Id.* § 623A introductory note; *see also* Keeton et al., *supra*, § 128, at 967 (noting that the "cause of action probably is as broad as any injurious falsehood which disturbs prospective advantage, and it is not necessarily confined even to commercial relations"); *Ruiz v. Varan*, 110 N.M. 478,

797 P.2d 267, 269–70 (1990) (discussing elements of injurious falsehood); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987) (same); *Ramada Inns, Inc. v. Dow Jones & Co., Inc.* 543 A.2d 313, 328 (Del.1987) (same).[2]

■ The multi-peril policy's reference to "the offense" of the publication of other defamatory or disparaging material is also broad enough to include certain claims for intentional interference with contract. "There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract," *Restatement (Second) of Torts* § 766 cmt. k (1979), and as a result there are a variety of ways in which interference with another's contractual rights may constitute a tort, *see id.* § 766 cmts. k-n. Making false representations is one such method of tortious interference. *Id.* § 767 cmt. c; Keeton et al., *supra*, § 129, at 992; *see also Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1445 (10th Cir.1992) (analyzing claims for "intentional interference with protected property interests, intentional interference with prospective business relationships, and unfair competition" by considering whether the defendant intentionally made false statements or made statements recklessly or with gross negligence as to their truth); *City of Brady v. Bennie*, 735 S.W.2d 275, 279 (Tex.Ct.App. 1987) (discussing intentional interference with contract claim involving publication of a letter); *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543, 546 (1969) (same).

■ In the instant case, the Houses' claim for intentional interference with contract does allege that Bankwest interfered with their contractual rights and business relations by publishing such false statements. In particular, the letters of estoppel that Bankwest allegedly sent to the Colorado banks asserted that those banks were "estopped" from advancing any additional funds to the Houses. Viewed in conjunction with the other allegations of the Houses' petition, Bankwest's assertion of the limitations on the Colorado banks' lending authority was not true: because Bankwest had no right to in-

---

**2.** Similarly, slander of title has been defined by one Kansas court as " 'a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, causing him injury,' " *Safety Fed. Sav. & Loan Ass'n v. Thurston*, 8 Kan.App.2d 10, 648 P.2d 267, 270 (1982) (quoting 50 Am.Jur.2d *Libel & Slander* § 539, at 1058 (1970)).

terfere with the lines of credit that the Houses' had established with the Colorado banks there was no basis for such an estoppel.[3] Moreover, according to the Houses' petition, Bankwest's false statements about the Colorado banks' lending authority caused the Houses to suffer pecuniary loss.

In reaching the contrary conclusion, the district court appears to have read the phrase "other defamatory or disparaging material" too narrowly. Although the estoppel letters sent by Bankwest did not directly attack the Houses' character, the Houses did allege that these letters harmed a "legal interest ... that ha[d] pecuniary value." *See Restatement (Second) of Torts* § 623A introductory note; *see also Hurlbut,* 749 S.W.2d at 766 (contrasting action for defamation with action for injurious falsehood and noting that "[t]he action for defamation is to protect the personal reputation of the injured party, whereas the action for injurious falsehood or business disparagement is to protect the economic interests of the injured party against pecuniary loss"); *Georgia Soc. of Plastic Surgeons, Inc. v. Anderson,* 257 Ga. 710, 363 S.E.2d 140, 143 (1987) (stating that action for injurious falsehood protects economic interests).

This is a close case. But Kansas law—as does the law in most states—assists with the resolution of such cases. As discussed earli-er, we must construe the multi-peril policy in favor of the insured, Bankwest. Thus we conclude that "the publication of ... other defamatory or disparaging material" is susceptible of a construction supporting coverage of the Houses' claim that Bankwest interfered with their contractual and business relations by sending the estoppel letters. Accordingly, under the terms of the personal injury section of the multi-peril policy, Fidelity was obligated to defend Bankwest in the Houses' lawsuit.[4] *See Spivey v. Safeco Ins. Co.,* 254 Kan. 237, 865 P.2d 182, 188 (1993) (concluding that when a petition alleges both acts that are covered and acts that are not, "these alleged facts give rise to the potential for liability, and the duty to defend arises"). The district court erred in granting summary judgment to Fidelity on the duty to defend issue.

■ As to the question of whether Fidelity is obligated to indemnify Bankwest, we conclude that further development of the record is necessary. When a case is settled, the duty to indemnify " 'must be determined [o]n the basis of the settlement.' " *American Motorists,* 946 F.2d at 1488 (quoting *Travelers Ins.,* 883 F.2d at 1099) (alteration in original). Here, the settlement agreement in the Houses' lawsuit specifies neither the claims settled nor the amounts paid to settle each claim. Whether any of the settlement

---

3. In characterizing the Houses' lawsuit as involving no allegations of defamation or disparagement, Fidelity relies in part on testimony of Jerry Fairbanks, the Houses' attorney, in a deposition taken in the course of discovery in this case. In response to the question, "And you made on behalf of the plaintiffs no allegation that the estoppel letters contained a falsehood?", Mr. Fairbanks replied, "That's correct. It wasn't so much what they said, it was that they were sent." Applt's App. at 281.

For several reasons, Mr. Fairbanks's testimony does not affect our assessment of the estoppel letters. First, in assessing the existence of the duty to defend and the duty to indemnify, the language of the petition and the other pleadings in the Houses' case should control. After-the-fact characterizations cannot alter the nature of the allegations in the underlying lawsuit. In addition, in other parts of his deposition testimony, Mr. Fairbanks stated that the Houses' allegation was that Bankwest had specifically agreed not to interfere with their lines of credit. *See id.* at 363–65. In light of that alleged agreement, it follows that (according to the Houses)

Bankwest's statement to the Colorado banks that they were "estopped" from advancing any additional funds was not true.

Nevertheless, Mr. Fairbanks's testimony might constitute some evidence as to the strength of the Houses' claims. If in spite of the Houses' allegations to the contrary, Fidelity can demonstrate that Bankwest's letters of estoppel were true and that the Houses and Bankwest were aware of the truth of these letters when they settled the case, then this might have some impact on the determination of the amount that Bankwest paid to settle the intentional interference with contract claim. This is a matter we leave for the district court's consideration on remand.

4. We emphasize that it is not the Houses' allegation of damage to reputation that brings their lawsuit within the coverage provided by the personal injury section of the multi-peril policy. Instead, it is Houses' assertion of a claim that, in light of all of its elements, can reasonably be described as the publication of defamatory or disparaging material (*i.e.,* the claim for intentional interference with contractual and business relations) that is dispositive.

constituted payment for the Houses' claim alleging intentional interference with contractual and business relations is a question we leave for the district court's determination on remand.[5]

In summary, we conclude that the personal injury section of the multi-peril policy obligated Fidelity to defend the Houses' lawsuit and that further development of the record is necessary to determine whether Fidelity is obligated to indemnify Bankwest. The district court's order granting summary judgment to Fidelity and denying summary judgment to Bankwest is reversed and remanded for proceedings consistent with this opinion.

REVERSED and REMANDED

---

**5.** Bankwest also argued that Fidelity's eight-month delay in determining whether to defend the Houses' lawsuit, coupled with statements by Fidelity's agents expressing difficulty in deciding whether to defend, should estop Fidelity from denying such a duty. In light of our conclusion that the personal injury section of the multi-peril policy required Fidelity to defend Bankwest, Bankwest's estoppel argument is moot.