**Charles Alfred SWANSON,
Plaintiff-Appellant,**

v.

**MID–SOUTH TITLE INSURANCE
CORP., Defendant-Appellee.**

Court of Appeals of Tennessee,
Western Section, at Nashville.

Nov. 6, 1984.

Permission to Appeal Denied
April 29, 1985.

Tom W. Moore, Jr., Columbia, for plaintiff-appellant.

Jack B. Henry, Pulaski, for defendant-appellee.

CRAWFORD, Judge.

Plaintiff, Charles Alfred Swanson (hereinafter Swanson), appeals from the judgment for the defendant, Mid-South Title Insurance Corporation (hereinafter Mid-South), of the Circuit Court sitting without the intervention of a jury. The case was originally tried in the General Sessions Court and upon Swanson's appeal was tried *de novo* in the Circuit Court.

The controversy involves coverage under a title insurance policy issued by Mid-South to Swanson when Swanson purchased a tract of land from one Wayne Kelly. The metes and bounds description of the property contained in the insurance policy and in the warranty deed from Kelly to Swanson provides: "... containing 30 acres more or less." The warranty deed, however, expressly provides that the land conveyed "is being sold by the tract and not by the acreage."

The policy provisions of the title insurance policy pertinent to the issues before us are:

MID–SOUTH TITLE INSURANCE
CORPORATION MEMPHIS,
TENNESSEE

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, MID–SOUTH TITLE INSURANCE CORPORATION, a Tennessee corporation, herein called the Company, insures, as of Date of Policy shown in Schedule

A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate of interest described in Schedule A being vested otherwise than as stated therein;
2. Any defect in or lien or encumbrance on such title;
3. Lack of a right of access to and from the land; or
4. Unmarketability of such title.

&ast; &ast; &ast; &ast; &ast; &ast;

## OWNERS POLICY OF TITLE INSURANCE

| AMOUNT | Schedule A | CASE NUMBER |
|---|---|---|
| $14,500.00 | Name of Insured | _____ |

### CHARLES ALFRED SWANSON

1. The estate or interest in the land described herein and which is covered by this policy is:

Fee simple.

2. The estate or interest referred to herein is at Date of Policy vested in:

Charles Alfred Swanson

&ast; &ast; &ast; &ast; &ast; &ast;

### SCHEDULE B

This policy does not insure against loss or damage by reason of the following:

&ast; &ast; &ast; &ast; &ast; &ast;

4. Any discrepancies, conflicts, encroachments, servitudes, shortages in area and boundaries or other facts which a correct survey would show.

&ast; &ast; &ast; &ast; &ast; &ast;

A public road running north and south traverses Swanson's property as described in the deed near its eastern border, and some time after acquiring the property, Swanson noted building activity on the east side of the road. Upon inquiry, he found that one Donna Bue had acquired land from Wayne Kelly approximately a year before Swanson and that the property acquired by Bue was described as running to the public road on the western side thereof. In the face of this controversy concerning the property of Swanson and Bue, Swanson contacted the attorney who had prepared the legal documents, handled the closing of his transaction with Kelly and who had in fact procured the title insurance policy from the defendant for Swanson. Swanson requested that the title insurance company clear up the controversy that had presented itself, but was informed both by the attorney and by other representatives of Mid-South that this problem was not covered by the title policy, that this was a boundary line dispute and was excepted from coverage by the provision of Schedule B of the policy as follows:

This policy does not insure against loss or damage by reason of the following:

&ast; &ast; &ast; &ast; &ast; &ast;

Any discrepancies, conflicts, encroachments, servitudes, shortages in area and boundaries or other facts which a correct survey would show.

Swanson then proceeded in the Chancery Court to clear the title and establish the boundary line and also to claim breach of warranty against his grantors—Kelly and wife. The Chancery Court lawsuit culminated with a judgment in favor of Bue on the establishment of the boundary line and resulted in Swanson's loss of approximately five acres of land for which he was awarded a judgment against Kelly in the amount of $2,500. Swanson's present lawsuit is to recover the expenses of litigation and other losses occasioned by the litigation in Chancery Court.

The final decree of the trial court contains findings of fact which we quote:

1. The plaintiff Charles Swanson bought the real estate in question from Wayne Kelly.

2. Joe Fowlkes, a Pulaski attorney, rendered a title opinion to Mr. Swanson, and also sold him a title insurance policy which insured the title to said real estate, with some exceptions.

3. A short while after closing the sale of the property and after receiving the

title insurance policy, the plaintiff became aware of an encroachment problem on the north boundary of his property.

4. After unsuccessfully attempting to settle the boundary line question, the plaintiff dismissed Joe Fowlkes as his attorney and retained Tom Moore, Jr., of the Maury County Bar, and they filed a lawsuit in Giles County Chancery Court against Donna Bue. This resulted in a judgment of $2,500 being awarded to Mr. Swanson for the loss of certain property, and the establishment of the boundary line by the Court on the north side of the property.

5. The plaintiff's contract with Mr. Moore was on an hourly charge of $60 per hour, for a total fee of some $4,000 for legal fees incurred in the suit against Donna Bue. The plaintiff had previously notified the defendant Company that he expected them to pay all of his legal expenses incurred in the Bue lawsuit, and the Company had declined to do so, alleging that an exception to their coverage under the policy was any discrepancy which might be ascertained by an accurate survey of the premises to be insured.

6. Indeed, in each of the two title opinion letters rendered by Mr. Fowlkes, the following exception was included:

"2. Easements, or claims of easements, not shown by the public records, and any discrepancies, conflicts, servitudes or shortage in area and boundaries or other facts which a current and correct survey would show."

7. The Court finds that this exception means precisely what it says, and that is that the title policy does not include any discrepancies or conflicts in the boundaries which would have been ascertained by an accurate survey.

8. The plaintiff had each of these title opinions in his possession, and, being a graduate engineer from Auburn University, he could understand the meaning of this boundary line and survey exception. It is necessary that the plaintiff request that the policy not exclude boundary line conflicts. An attorney cannot guarantee freedom from boundary line conflicts in his title opinion without having an accurate and complete survey made of the property prior to issuing a title opinion and a title insurance policy.

9. The attorney fees incurred by Mr. Swanson in his lawsuit with Donna Bue were between himself and his attorney, and the exception to his title opinion and title insurance policy rendered the defendant Company free from any liability for payment of those fees.  . - - -

The two issues presented for review by Swanson may be consolidated into one issue as follows:

Does Mid-South's policy provide coverage to Swanson for losses and expenses incurred in prosecuting the suit to clear title, establish a boundary line and for a breach of warranty.

Swanson's brief suggests, "a pivotal question in this case involves the proper construction and interpretation of the term 'correct survey.'" Swanson further states:

Plaintiff-appellant contends that a correct survey made from the legal description in his deed, and made at the time he purchased title insurance would not have shown or disclosed any defect, conflict or lack in his title, and the fact of a defect, conflict or lack could only be ascertained from the public records.

As to ascertaining any defect or conflict from the public record, we find, as the trial court implicitly found that the tracts of land conveyed to Bue and Swanson respectively were separately described tracts of land in the deed by which the grantor Kelly acquired title. Joe Fowlkes, attorney, who prepared the title papers and examined the title testified, "I searched the title and it's clearly an encroachment. It is not a situation where somebody conveyed off some of this property. There's never been a conveyance off of this tract that Mr. Swanson has. The line has been encroached upon through the years, and of course that hap-

pens with time, particularly when you have got a description that old. That description goes back at least 75 or 80 years."

We could agree with Swanson that the public records might reveal the conflict between the Bue and Swanson deeds if, and only if, the property acquired by these parties was conveyed by Kelly out of a single tract of land. As the matter stands, however, with the separate tracts of land conveyed by Kelly, the records do not provide notice of the conflict and discrepancy between the descriptions of the respective deeds.

The major thrust of Swanson's argument is that had a correct survey been made at the time of the closing of the transaction and the issuance of the title policy, there would have been no revelation of any problem because Bue did not start improvements on the land until some time after this date. In other words, Swanson contends that the phrase in the exception regarding "correct survey" means a survey made at the time the title policy is issued. As noted by Swanson in his brief, there appear to be no Tennessee cases on this pivotal question as to the meaning of "correct survey." Both Swanson and Mid-South have cited to this court cases from other jurisdictions with apparent holdings in support of their respective views. Our courts are not bound by decisions of appellate courts of foreign states, but we may look to these decisions for guidance in rendering our decision. The cases cited have diverse facts, and it would serve no purpose to elaborate on them since the courts of this state have on many, many occasions in the past been called upon to construe and interpret policies of insurance.

■ Tennessee law requires that in construing contracts, the words expressing the parties' intentions should be given the usual, natural and ordinary meaning. *Ballard v. North American Life & Casualty Company*, 667 S.W.2d 79 (Tenn.App.1983), *Moore v. Life and Casualty Insurance Co.*, 162 Tenn. 682, 40 S.W.2d 403 (1931).

■ In the absence of fraud or mistake a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust. *Ballard v. North American Life & Casualty Company, supra, E.O. Bailey & Co. v. Union Planters Title Guaranty Co.*, 33 Tenn.App. 439, 232 S.W.2d 309 (1949).

The guiding principles for construction of insurance contracts are set out in *Guardian Life Insurance Company of America v. Richardson*, 23 Tenn.App. 194, 129 S.W.2d 1107 (1939) as:

> Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and proper sense. The rule of strict construction does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence (intention) as expressed, or to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties and embodying requirements, compliance with which is made the condition to liability thereon. Neither does the rule prevent the application of the principle that policies of insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties. (Citations omitted).

129 S.W.2d at 1115, 1116.

■ We find no ambiguity in the policy provision heretofore set out. We believe Swanson has attempted to strain the construction of the exception clause regarding the "correct survey" by insisting that this phrase means a survey at or around the time of the issuance of the policy of title insurance. The clause itself sets no time frame, and it is obvious that it was meant to take care of situations where a defect or claim is only made apparent by

circumstances that exist outside of the record. This is an obvious conclusion from the fact that had the survey been made at the time the policy was issued, no defect or claim would have been revealed and the survey exception would have been deleted from the policy. Thus Mid-South would have been liable under the facts of this case. With the survey exception a part of the policy, the obligation of Mid-South was only to insure the title to the property actually acquired by Swanson if the defects were not revealed by the record title.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

We concur in the findings of fact of the trial court and find no error of law by the court in the construction of the contract. Accordingly, the judgment of the trial court is affirmed and costs are adjudged against the appellant.

NEARN, P.J. (W.S.), and TOMLIN, J., concur.