IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 4, 2003 Session

# MARLIN FINANCIAL & LEASING CORPORATION v. NATIONWIDE MUTUAL INSURANCE COMPANY

Appeal from the Chancery Court for Hamilton County
No. 01-0722     Howell N. Peoples, Chancellor

No. E2003-01045-COA-R3-CV - FILED JULY 29, 2004

This is a declaratory judgment action filed by Marlin Financial & Leasing Corporation ("Marlin") against its insurer, Nationwide Mutual Insurance Company ("Nationwide"), seeking a determination as to coverage under Marlin's insurance policy with Nationwide. Specifically, the suit seeks to obligate Nationwide to pay $8,333.33, the amount of Marlin's settlement of a claim asserted by AmSouth Bank ("AmSouth" or "the Bank"), and associated attorney's fees and expenses of $52,654.05. The trial court granted summary judgment to Marlin, finding that AmSouth's claim against Marlin for "loss of use" of certain property was covered under the business liability feature of the policy and that Marlin was entitled to reimbursement for the amount of its settlement of AmSouth's claim and Marlin's related litigation expenses. The trial court ultimately awarded Marlin prejudgment interest, but it refused to assess a bad faith penalty against Nationwide. Nationwide appeals and both sides raise issues. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, J., joined. HOUSTON M. GODDARD, P.J.,[1] did not participate in the Court's decision.

Parks T. Chastain, Nashville, Tennessee, for the appellant, Nationwide Mutual Insurance Company.

John B. Curtis, Jr., Chattanooga, Tennessee, for the appellee, Marlin Financial & Leasing Company.

**OPINION**

---

[1]This case was originally assigned to Judge Goddard for the preparation of an opinion. When he passed away on April 2, 2004, the case was reassigned to Judge Susano.

I.

Marlin is in the business of brokering leases among vendors, customers, and financial institutions. On March 20, 1997, Marlin entered into a lease agreement with Island Cove Marina & Resort ("Island Cove") for boat racks and a dry storage building. Prior to entering into the lease, Marlin arranged for financing through AmSouth Bank. In determining whether to provide financing, AmSouth relied upon financial information it had received from the owners of Island Cove.

The master lease schedule entered into between Marlin and Island Cove provides, in pertinent part, as follows:

> F. SPECIAL CONDITIONS: . . . (2) Unless otherwise stated in this Schedule, [Island Cove] is hereby given an option to purchase the Equipment at the end of the lease term for an amount equal to its then fair market value.
>
> G. OWNER: The Equipment leased herein is owned by [Marlin] (referred to in the Lease as "Owner").

(Capitalization in original).

The master lease agreement entered into between Marlin and Island Cove provides, in pertinent part, as follows:

* * *

> **7. EXPIRATION OF TERM AND RETURN OF EQUIPMENT.** Upon the expiration of the term of this Agreement . . . [Island Cove] shall promptly return the Equipment . . . at its sole expense . . . to such place as [Marlin] may designate . . . . If [Island Cove] shall retain possession of the Equipment . . . after the expiration or earlier termination of this lease, [Island Cove] shall be deemed to be holding over [on] a month-to-month basis, and all terms hereof shall remain in full force and effect, including the payment by [Island Cove] of rent.
>
> [Island Cove] shall make the Equipment available for inspection by prospective buyers at any reasonable time or times prior to [the] Expiration or termination of this Lease. At the option of [Marlin], [Marlin] may keep the Equipment on [the] premises until [Marlin] shall have leased, sold, or otherwise disposed of the Equipment. . . .

**8. TITLE OF LESSOR: POSSESSION AND USE OF THE EQUIPMENT.**  Title to the Equipment shall at all times remain in [Marlin]. . . .

\* \* \*

**17. ASSIGNMENT BY LESSOR.** [Marlin] may transfer, sell, or assign this Lease, title to the Equipment, and/or any rents or other sums due to become due hereunder, or delegate any of [Marlin's] duties hereunder without prior notice to or the consent of [Island Cove] and in such event [Marlin's] transferee or assignee shall have all the rights, powers, privileges and remedies of [Marlin] under this Lease.

\* \* \*

**19. REMEDIES.** *Upon the occurrence of any Event of Default*, and at any time thereafter so long as the same shall be continuing, [*Marlin*] *may declare this Lease in default*.  Such declaration shall be made by written notice mailed to [Island Cove] at its address specified above.  *Upon the mailing of such notice,* [*Island Cove*] *hereby authorizes* [*Marlin*] *at any time and from time to time to enter upon, with or without legal process, any premises where the Equipment may be located and take possession thereof at* [*Island Cove's*] *expense*.  Additionally, upon the mailing of the notice declaring the Lease in default, [Island Cove], without further demand, shall pay to [Marlin] an amount equal to any unpaid rentals or other monies due on or before an Event of Default, plus as liquidated damages, and not a penalty, at an amount equal to the present value of all rentals remaining to be paid under the Lease together with the present value of [Marlin's] residual interest of the Equipment (as if no default had occurred) discounted using a simple interest rate per annum equal to the "Federal Funds Rate" means the average between the high and low Federal Funds money rate published (as of the date of the Event of Default (or the next business day)[)] in *The Wall Street Journal* such rate representing reserves traded among commercial banks for overnight use in amounts of one million dollars or more.  If the value of the residual interest of the Equipment is not specified in the Schedule, it shall be deemed the fair market value of the Equipment at the end of the term of the Lease.  *Thereupon,* [*Marlin*] *shall (i) sell the Equipment at a private or public sale, in bulk or in parcels, with or without notice, and at* [*Marlin's*] *option, without having to have the Equipment present at the place of sale, or*

*(ii) lease, otherwise dispose of or keep idle all or part of the Equipment subject, however, to its obligation to mitigate damages, and (iii) at [Marlin's] option, use [Island Cove's] premises for any or all of the foregoing without costs, damages, or otherwise.* The proceeds of sale, lease or other disposition of the Equipment shall be applied first (1st) to all of [Marlin's] costs incurred in obtaining possession of and selling the Equipment, second (2nd), to any unpaid sums or other monies due [Marlin] under the Lease, including unpaid rentals, costs, and any indemnification then remaining unpaid; third (3rd) to the liquidated damages due [Marlin] under this Lease; fourth (4th) to any incidental damages of [Marlin]; and fifth (5th) any surplus funds, if any, shall be paid to [Island Cove]. In addition to any remedies set forth herein or otherwise available at law, [Marlin] shall also have all the rights and remedies afforded to [Marlin] under UCC – [L]eases § 47-2A-I 01. *et seq.*, including but not limited to UCC – [L]eases § 47-1-A-508.

In the event [Marlin] shall be entitled to possession of the Equipment pursuant to the Section, due to an Event of Default, [Island Cove] (at its own expense) shall cause the Equipment to be delivered to [Marlin] at such point or points designated by [Marlin] in accordance with Section 7. At the option of [Marlin], [Marlin] may keep the Equipment on any of the premises of [Island Cove] (or where the Equipment is located) until [Marlin] shall have leased, sold, or otherwise disposed of the Equipment. For such purposes, [Island Cove] agrees to use its facilities without charge. [Island Cove] shall pay [Marlin] all costs and expenses, including reasonable attorney's fees, incurred by [Marlin] in exercising any of its rights or remedies hereunder.

No remedy provided herein is intended to be exclusive, but each shall be cumulative, and shall be in addition to any other remedy referred to herein or otherwise available to [Marlin] at law or in equity. The exercise of any of the remedies provided herein shall not be deemed to constitute a termination of this Lease unless [Marlin] so notifies [Island Cove] in writing.

\* \* \*

**26. FILING AS TRUE LEASE, SECURITY INTEREST.** [Island Cove] shall execute any such documents or financing statements as [Marlin] deems to be necessary or advisable and shall otherwise cooperate to defend the title and interest of [Marlin]. [Island Cove] agrees to pay all costs of preparing and filing any such

> documentation. . . . It is expressly agreed that any filings or financing statements shall not be deemed to affect the nature of this Lease as a true and bona fide equipment lease and/or a Finance Lease, but rather to give notice to all interested parties of [Marlin's] interest in the property. . . .

(Boldface type and capitalization in original) (emphasis added).

Upon entering into the lease, Marlin assigned all of its right, title, and interest in the boat racks and dry storage building to AmSouth. Marlin then entered into a second lease with Island Cove on August 28, 1997, for three floating docks. The terms of the second lease are identical to those of the first lease. As before, AmSouth provided the financing, and in return, Marlin assigned its right, title, and interest in the docks to the Bank.

The initial lease assignment from Marlin to AmSouth provides, in pertinent part, as follows:

> 1. [Marlin] hereby assigns to [AmSouth] its entire right, title and interest in and to that certain Master Lease Agreement ("the Lease") . . . between [Marlin] and [Island Cove], together with [Marlin's] right to receive all rent and other monies thereunder, and all of [Marlin's] right, title and interest in and to any guaranties or other rights and interests granted to [Marlin] to secure the payments due under the terms of the Lease. [Marlin] retains the right, title and interest to any amounts paid by [Island Cove] should [Island Cove] exercise its option to purchase the Equipment . . . at the end of the lease term. Should [Island Cove] not exercise this option, [Marlin] retains the right to take possession of the Equipment and the right to all proceeds from the sale or other disposition of the Equipment.

The assignment of the August, 28, 1997, lease to the Bank provides, in pertinent part, the following:

> 1. [Marlin] hereby assigns to [AmSouth] its entire right, title and interest in and to that certain Master Lease Agreement ("the Lease") dated August 28, 1997 and entered into by and between [Marlin] and [Island Cove], together with [Marlin's] right to receive all rent and other monies thereunder, and all of [Marlin's] right, title and interest in and to any guaranties or other rights and interests granted to [Marlin] to secure the payments due under the terms of the Lease. Subject to Section 2 hereof, [Marlin] retains the right, title and interest to any amounts paid by [Island Cove] should [Island Cove] exercise its option to purchase the Equipment . . . at the end of the lease term. Should [Island Cove] not exercise this option, [Marlin] retains the right (subject to Section 2 hereof) to take possession of the

Equipment and the right to all proceeds from the sale or other disposition of the Equipment.

2. [Marlin's] right to receive payments from [Island Cove] at the end of the term of the Lease, as set forth in Section 1, is subject to the condition that [AmSouth] shall receive full payment of all other amounts due and owing by [Island Cove] to [AmSouth] under the Lease. Only after full payment of all amounts due and owing by [Island Cove] under the Lease to [AmSouth], shall [Marlin] receive any amounts retained in Section 1.

(Underlining in original). The Addendum to the August 28, 1997, lease assignment provides, in pertinent part, as follows:

1. Paragraph 1 of the Assignment of Lease dated the 28th day of August, 1997 by and between [Marlin] and [AmSouth] is amended to add the following:

"The last two sentences of Paragraph 1 of the Assignment of Lease, which state that [Marlin] retains the right, title and interest in and to any amounts paid by [Island Cove] should [Island Cove] exercise its option to purchase the equipment and the right to all proceeds from the sale or other disposition of the equipment, are subject to and explicitly contingent upon [Marlin's] having paid the Loan from [AmSouth] in full, and such Loan having been duly cancelled and released by [AmSouth] on its books. [AmSouth] retains and is granted by [Marlin] all rights to the equipment and the proceeds thereof until the Loan from [AmSouth] to [Marlin] has been paid in full.["]

2. This Assignment of Lease is unconditional as to AmSouth's right to repossess and dispose of the equipment and collect the proceeds thereof in the event of any default by [Marlin] in the payment of the Loan from [AmSouth] to [Marlin] during the Lease Term or at any time prior to final satisfaction of the Loan.

(Underlining in original).

In servicing the leases of the property to Island Cove, Marlin issued checks drawn on AmSouth to both Island Cove and the vendors who supplied improvements. Marlin then delivered the checks to Island Cove's chief manager, who in turn was to deliver the checks to the vendors.

When Island Cove subsequently filed for bankruptcy, it was discovered that its chief manager had forged endorsements on some of the vendor checks, resulting in those vendors never receiving payment for the boat racks or the third floating dock.

It was Marlin's responsibility to inspect the construction of all of the improvements. Because of Island Cove's fraudulent endorsements, not all of the checks earmarked for the dry storage building were delivered to the vendor, thus making it impossible to determine whose funds had been used to pay for the building. With respect to the boat racks, they were not installed by the vendor who had been identified in the lease agreement, and since the checks were not delivered to the appropriate vendor, there was no way to determine whose funds had paid for the boat racks. The third of the three floating docks was never constructed.

Island Cove filed for bankruptcy on September 14, 1998, after which no further payments on the AmSouth loans were made. Thereafter, both R & F Leasing and Pioneer Bank asserted an interest in the dry storage building and boat racks; additionally, Pioneer Bank claimed at least a partial interest in the floating boat docks. Island Cove then filed a claim against AmSouth, as Marlin's assignee, for the purpose of determining the extent and validity of AmSouth's interest in and to the dry storage building, boat racks, and floating docks.

At this point, Marlin persuaded AmSouth to forego joining it as a party to the bankruptcy litigation in exchange for Marlin's assistance in establishing the Bank's ownership interest in the Island Cove improvements. As a part of this arrangement between AmSouth and Marlin, the parties entered into a tolling agreement, which preserved the Bank's right to file suit against Marlin at a later time.

In the bankruptcy proceeding, a settlement was ultimately achieved. By the terms of the settlement, AmSouth received a security interest in two floating docks and the right to 25% of the apportioned sale proceeds attributable to the value of the dry storage building. As a part of the settlement, AmSouth gave up its interest in one floating dock, 75% of the dry storage building, and all of the boat racks.

Marlin assisted AmSouth in filing suit against Cornerstone Bank ("Cornerstone"), which had accepted some of the fraudulently-endorsed checks. The case against Cornerstone was later settled in mediation. Marlin, as a part of a global settlement, paid AmSouth $8,333.33 to settle any claims that the Bank had against it.

Prior to the litigation in the bankruptcy and Cornerstone cases, Marlin, in a letter dated December 11, 1998, had informed its insurer, Nationwide, of the negligence claims being asserted by AmSouth against Marlin. Nationwide had issued a businessowners insurance policy to Marlin that was effective from March 7, 1996, until March 7, 1997; Marlin had renewed the policy from March 7, 1997, through March 7, 1998. The policy's Businessowners Liability Coverage Form provided, in pertinent part, the following business liability coverages:

A. **COVERAGES**

1. **Business Liability**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.  We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. . . .

\* \* \*

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under COVERAGE EXTENSION – SUPPLEMENTARY PAYMENTS.

\* \* \*

e.  **Coverage Extension – Supplementary Payments**

In addition to the Limit of Insurance, we will pay, with respect to any claim or "suit" we defend:

\* \* \*

(4) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," . . . .

\* \* \*

F. **LIABILITY AND MEDICAL EXPENSES DEFINITIONS**

\* \* \*

-8-

12. **"Property Damage"** means:

\* \* \*

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Capitalization and boldface type in original).

On December 22, 1998, Nationwide gave Marlin's claim to its employee, Rockwell Dukes, for investigation. One month later, Nationwide notified Marlin that the issue of coverage was being investigated, particularly as to the issue of whether a professional services exception applied to Marlin's claim. Marlin's policy contained an exception which provided that Nationwide did not provide coverage for injuries "due to rendering or failing to render any professional service." The policy then contained a list of activities which were not covered under the policy, which included accounting and legal services, supervisory services, and medical services, among many others.

In October, 1999, the Liability Insurance Research Bureau ("the Bureau"), which researches and provides opinions to insurance companies on coverage issues, issued an opinion at the request of Nationwide. It advised Nationwide that the professional services exception contained in the policy was *not* applicable to lease brokers such as Marlin. The Bureau reasoned that "[w]hile being a lease broker requires training, the training is not to the level of specialized intellectual training such as that of a doctor, lawyer, engineer, or architect." Two months after receiving the Bureau's opinion, Nationwide forwarded Marlin's case to an attorney and requested a second opinion on the coverage issue. On February 18, 2000, Nationwide sent a letter to Marlin, advising that it was denying coverage of Marlin's claim. Marlin made a second demand for coverage, claiming it was entitled to reimbursement of legal expenses incurred in assisting AmSouth, as well as reimbursement of the funds paid to the Bank as part of the settlement in the Cornerstone litigation. Nationwide again denied coverage.

Marlin filed suit against Nationwide on June 22, 2001, claiming that Nationwide had breached its insurance contract with Marlin by failing to defend and indemnify it against the claims of AmSouth. In its complaint, Marlin sought a declaratory judgment of its rights under the Nationwide policy and asserted that it was entitled to indemnification and reimbursement of attorney's fees and expenses; reimbursement of the AmSouth settlement; interest; and costs. Nationwide answered, denying all liability. Marlin later amended its complaint to assert that is was entitled to the 25% bad faith penalty, codified at Tenn. Code Ann. § 56-7-105 (2000). Both parties filed motions for summary judgment.

The trial court filed its initial memorandum opinion and order on July 1, 2002. In that opinion, the trial court held that the professional services exception in the insurance policy did not apply to Marlin. The trial court then considered the issue of whether the insurance policy provided

coverage for attorney's fees and expenses since no lawsuit was filed against Marlin. The court concluded that "the actions of Nationwide, through its agent Rockwell Dukes, waived the right to insist upon a formal lawsuit to trigger coverage and/or created a new contract with Marlin in which it could not deny coverage on the basis of whether a formal lawsuit had been filed against Marlin." In addition, the court held that "the undisputed facts show that Nationwide should be estopped from insisting that a lawsuit is necessary to trigger coverage." Finally, the court addressed the issue of whether the damages sought by Marlin on behalf of AmSouth constitute "property damage" as defined in the insurance policy. The court held that there were insufficient facts before it to determine whether AmSouth was the true owner of the property or whether the Bank merely held a security interest in the property, and therefore, the court concluded that it could not yet rule on the property damage issue. The court also reserved the issue of Nationwide's bad faith until the coverage issue could be resolved.

The trial court filed a second memorandum opinion and order on April 7, 2003, in which it opined that, contrary to its initial impression, the determination of what constitutes property damage does not hinge upon whether the agreement between AmSouth and Marlin is a true lease or a disguised security interest.[2] Instead, the court held that AmSouth, as Marlin's assignee, had the right, under Marlin's assignment of its rights to AmSouth, to repossess the property upon Island Cove's default. The trial court went on to note, however, that, due to Marlin's negligence, AmSouth lost its right to take possession, at least as to some of the property, thereby suffering a "loss of use" of that property. As this "loss of use" constitutes property damage under the Nationwide policy, the trial court reasoned that the Bank did indeed suffer property damage, which was covered under the policy. The trial court went on to address the issue of the bad faith penalty, holding that it was not appropriate in the instant case. Finally, the trial court held that Nationwide was not liable to Marlin for prejudgment interest.

Upon consideration of Marlin's motion to alter or amend the judgment, the trial court amended its previous judgment to allow for prejudgment interest against Nationwide in the amount of 10%. From this judgment, Nationwide appeals.

II.

In deciding whether a grant of summary judgment is appropriate, courts are to determine "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Courts "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn. 1993) (citations omitted).

---

[2]Nationwide did not argue below, and does not argue now, that this distinction is important in this case. On this point, it agrees with the trial court.

-10-

Since summary judgment presents a pure question of law, our review is *de novo* with no presumption of correctness as to the trial court's judgment. ***Gonzales v. Alman Constr. Co.***, 857 S.W.2d 42, 44-45 (Tenn. Ct. App. 1993).

III.

Nationwide raises three issues, which issues present the following questions:

> 1. Is Nationwide liable under the insurance policy for monies paid by Marlin to AmSouth in settlement of claims asserted by the Bank against Marlin; and for legal fees and expenses incurred by Marlin?

> 2. Do the damages suffered by AmSouth fall under the "property damages" language of the insurance policy issued by Nationwide to Marlin?

> 3. Did the trial court abuse its discretion in awarding Marlin prejudgment interest against Nationwide?

Marlin also raises an issue, *i.e.*, whether the trial court erred in failing to find that Nationwide "was guilty of bad faith in the handling of Marlin's request for defense and indemnification."

IV.

A.

Nationwide first contends that its insurance policy with Marlin does not provide coverage for the amounts paid to AmSouth to settle its claims against Marlin, nor does the policy cover Marlin's legal fees and expenses. In support of its position, Nationwide relies upon the language of the insurance policy, which provides that it will cover "those sums that [Marlin] becomes legally obligated to pay as damages because of . . . 'property damage,' . . . to which this insurance applies," and that Nationwide "will have the right and duty to defend any 'suit' seeking those damages." The applicable insurance policy defines "suit" as follows:

> "Suit" means a civil proceeding in which damages because of . . . "property damage," . . . to which this insurance applies are alleged. "Suit" includes:

>> a. An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

-11-

> b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

Citing this language, Nationwide contends that its obligation to provide coverage is contingent upon the condition precedent of the filing of a lawsuit against the insured. Because AmSouth never filed suit against Marlin, Nationwide claims that it is not liable for Marlin's legal fees and settlement costs.

In the seminal case of ***Bill Brown Constr. Co. v. Glens Falls Ins. Co.***, 818 S.W.2d 1 (Tenn. 1991), the Supreme Court concluded that an insurer "may be estopped to deny coverage for any loss by the misrepresentations of its agent upon which the insured reasonably relies." ***Id.*** at 12. In expounding on its pronouncement, the court stated that it

> reaffirm[ed] the long-standing rule in Tennessee that *any* contractual provision of a policy of insurance, whether part of an insuring, exclusionary, or forfeiture clause, may be waived by the acts, representations, or knowledge of the insurer's agent.

*Id.* at 13 (emphasis in original).

On January 25, 1999, Marlin's attorney, John B. Curtis, Jr., wrote a letter to Dukes of Nationwide summarizing the events surrounding AmSouth's potential claim against Marlin. The tolling agreement between Marlin and AmSouth had not yet been executed. Dukes was questioned by Curtis about the letter during his deposition:

> Q: All right. And did you receive a letter from me dated January 25 concerning this particular claim?
>
> A: Yes.
>
>        \*   \*   \*
>
> Q: [Were you] advised in this letter that AmSouth had indicated an intention to name Marlin as an adverse party in the bankruptcy proceedings or a separate proceeding[?]
>
> A: Yes.
>
> Q: And were you advised at this time that we had persuaded AmSouth to forego any adversary proceeding as to Marlin until the dispute regarding ownership of the leased property was resolved?
>
> A: Yes.

-12-

Q:Was it explained to you that the purpose of that was to avoid unnecessary attorney fees and to possibly avoid litigation down the line if we were able to prove ownership of the property?

A: I believe that was the explanation given.

Q: Were you also advised in this letter about AmSouth's willingness to proceed in this fashion only if Marlin would execute a tolling agreement as to any statute of limitation?

A: Yes.

Q: Were you advised that it was thought best to have counsel present during any involvement between AmSouth and Marlin because of the potential for AmSouth filing a claim somewhere down the line against Marlin?

A: Yes.

* * *

Q: Were you asked in this letter to give your thoughts regarding the proposed tolling agreement?

A: Yes.

Q: And the P.S. acknowledges that we had a conversation on January 25 and that you indicated we should proceed with execution of the tolling agreement?

A: Yes.

Q: Do you recall having that conversation?

A: I recall speaking to you, but I do not recall specifics.

Q: Do you recall the topic of the tolling agreement coming up in our discussion?

A: I do remember something about the tolling agreement.

Q: Do you recall a discussion to the effect that it would be wise to go ahead and execute the tolling agreement in order to avoid a lawsuit by AmSouth at that point in time?

A: I believe so.

Q: Do you recall a discussion to the effect that these attorney fees in defense of Marlin would be incurred in any event; and that if it was later deemed that there was coverage, that Nationwide could simply reimburse that expense?

A: I believe that was the agreement, that if there was coverage, we would reimburse; if there wasn't, we wouldn't. And at that time, we were uncertain as to whether coverage applied or not.

Q: And did you think it was best that we enter into the tolling agreement at that time in order to avoid the immediate lawsuit and the fees that would be incurred as a result?

A: I believe so.

Based upon Curtis' letter to Dukes and their conversation of January 25, 1999, it was reasonable for Marlin to believe that the failure of AmSouth to bring suit would not be, in and of itself, a bar to coverage. As the trial court stated, while Nationwide had informed Marlin from the outset "that the issue of coverage was under investigation," it had "never informed Marlin that the basis for the denial would be that a formal lawsuit had never been initiated." Indeed, Marlin was initially informed that the coverage investigation revolved around the professional services exception. Nationwide later stated – in a letter dated February 18, 2000 – that the nature of AmSouth's damages might also be excluded, and that other unidentified exclusions could apply. Significantly, none of this specifically advised Marlin that Nationwide was relying upon the policy requirement that suit be filed. Furthermore, Nationwide's reliance on this provision is totally inconsistent with its reaction to the tolling agreement as fleshed out by the Curtis/Dukes' discussion regarding that agreement and the surrounding circumstances.

We agree with the trial court that Nationwide waived the lawsuit requirement through the words, action, and non-action, of its agent, Dukes. As the trial court stated, "[i]f Nationwide did not intend to provide coverage based on the fact that AmSouth had not filed a lawsuit against Marlin, a requirement that is expressly stated in the written policies, it should have consistently informed Marlin that no expenses would be covered until a formal lawsuit was brought against Marlin."

Furthermore, we agree with the trial court that the doctrine of estoppel prevents Nationwide Insurance from relying on the lawsuit provision. Finding the trial court's analysis of the estoppel argument to be quite well-reasoned, we will quote from it liberally and adopt it as our own:

> Marlin informed Nationwide of the situation and sought approval for the actions it was taking and the expenses it was incurring. This was done at a very early stage in the litigation. Mr. Dukes represented that the expenses would be reimbursed if coverage was not denied. Marlin relied on the statement and incurred additional fees and

expenses. Nationwide was fully aware that Marlin was incurring expenses. Further, Nationwide was notified of Marlin's situation in December of 1998. It did not send Marlin a letter detailing the possible exclusions until February 18, 2000. During this time it was aware that Marlin was incurring expenses. Yet Nationwide did not inform Marlin that the lack of a formal lawsuit would preclude coverage, regardless of whether Marlin had coverage. The time lag between the time Marlin first contacted Nationwide in [late] 1998 and early 1999 until Nationwide gave Marlin a formal statement of its position in February of 2000 is another reason why Nationwide should be estopped from asserting the lawsuit provision. An insurance company cannot tell an insured that expenses related to avoiding expensive litigation will be paid, then sit back for months while the insured's expenses mount, and hope that the lawsuit settles so that the insurer can escape without expending any costs.

In short, Nationwide cannot have its proverbial cake and eat it, too. We hold that Nationwide waived the lawsuit requirement in Marlin's insurance policy, and alternatively, that Nationwide is estopped from asserting the suit requirement provision. Accordingly, Nationwide is liable to Marlin for its settlement costs, as well as its legal fees and expenses, *provided* the damages claimed by AmSouth constitute covered "property damage" under the terms of the policy. We now turn to the second of Nationwide's three issues, *i.e.*, whether AmSouth's damages are covered damages under the policy.

B.

Nationwide asserts that AmSouth sustained an "economic loss" and that its policy does not cover economic loss. More specifically, it contends that "loss of use" as *defined* in the policy does not encompass the type of loss suffered by the Bank. This argument requires us to examine Nationwide's policy and to do so under the strictures of the well-established principles of contract construction.

In interpreting contracts of insurance, we must, as a general rule, apply the same rules of construction as are applicable to other types of contracts. *See McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990). Such contracts are to be interpreted as they are written – absent any fraud or mistake – and their terms must be given their plain and ordinary meaning. *Swanson v. Mid-South Title Ins. Corp.*, 692 S.W.2d 415, 419 (Tenn. Ct. App. 1984). The law is well-settled in this state that any uncertainties or ambiguities in an insurance policy "must be construed strongly against the insurer and in favor of the insured." *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 366 (Tenn. 1973). However, the finding of an ambiguity does not end our inquiry. "Even if ambiguous, the questioned language must be susceptible to a *reasonable* interpretation," which would favor the party "seeking coverage under the policy." *Allstate Ins. Co. v. Barnes*, 896 S.W.2d 565, 571 (Tenn. Ct. App. 1995) (emphasis in original) (citing *Tata v. Nichols*, 848 S.W.2d 649, 651 (Tenn. 1993)).

When we look at the policy in the instant case, we are struck by the dearth of definitional language pertaining to the concept of "loss of use." The policy provides that it covers two types of "property damage," *i.e.*, "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured." It is clear that the boat racks, floating docks, and dry storage building are "tangible property" and it is likewise clear that none of the property under discussion suffered "physical injury." Thus, our focus is upon whether AmSouth lost the use of the boat racks, a significant part of the dry storage building, and one floating dock.[3] No issue is made with respect to Marlin's negligence.

In the instant case, Island Cove, the lessee of the property, brought about an "occurrence of [an] Event of Default" under paragraph 19 of the leases when it filed for bankruptcy protection. Nationwide does not contend otherwise. Under the leases assigned to AmSouth, that bankruptcy gave AmSouth the right to "take possession" of the property and the right to "sell" it or "lease, otherwise dispose of or keep idle all or part of the Equipment subject, however, to its obligation to mitigate damages." The issue before us is whether these contractual rights gave AmSouth the right to "use" the property as the word "use" is found in the concept of "loss of use."

When we examine the policy and particularly the definitional part of this insurance contract, we are struck by the fact that loss of use is not defined in any way. It certainly is not defined in a way that would exclude "economic loss" from its reach.

Since the policy does not define the concept of "loss of use," we must give those words their "usual, natural and ordinary meaning." *See Swanson*, 692 S.W.2d at 419. To aid us in this task, we turn to the dictionary. *See Am. Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 815 (Tenn. 2000); *Tata*, 848 S.W.2d at 653. The word "use" is defined as "[t]o put into service or apply for a purpose." *The American Heritage College Dictionary* 1486 (3d ed. 2000). "Loss" is defined as "[t]he condition of being deprived . . . of something." *Id.* at 801. Thus, as applied to the policy language before us and considering the operative facts, it appears that, given the ordinary meaning of these words, "loss of use" means the deprivation of the ability to put the boat racks, the missing floating dock, and the dry storage building into service or apply them for a purpose.

Nationwide strenuously contends that it did not intend to cover "economic loss;" but it can point to no language in the policy spelling this out. We recognize one could argue that "loss of use" is a vague term and hence somewhat ambiguous. This does not help Nationwide. As the author of the policy, Nationwide had it within its power to define loss of use in a way that would exclude "economic loss." It failed to do so. Thus, any ambiguity must be construed against Nationwide and in favor of Marlin, provided there is a reasonable interpretation of the "loss of use" language which would provide coverage for AmSouth's loss. *See Allstate*, 896 S.W.2d at 571.

---

[3]The one floating dock whose utility was lost by AmSouth was lost because it was never constructed. Nationwide argues that this dock – never having been built – cannot constitute "tangible property." Even if this be the case, it is clear that the other property, the use of which was lost due to Marlin's negligence, does constitute "tangible property."

The lease is very clear. Once Island Cove filed for bankruptcy, AmSouth had the right to take physical possession of all of the subject property. In other words, according to the dictionary, it had the right to possess the property and "put [it] into service" or "apply [it] for a purpose." While it was required to do certain things with the property in order to mitigate its damages, this does not change the fact that it had the right to use the property, *i.e.*, the right to sell it or "lease, otherwise dispose of or keep idle all or part of the" property under discussion. It lost that right, at least as to some of the property, because of the negligence of Marlin.

Thus, there is a reasonable interpretation of the policy that would cover AmSouth's loss. Since the insurance company chose not to define the somewhat-vague term of "loss of use," that failure is construed against Nationwide and in favor of an interpretation of the policy favorable to Marlin.

Nationwide relies on a number of cases from other jurisdictions to support its position that this case involves economic loss and that "property damage," under the language of the Nationwide policy, does not include economic loss. All of these cases are distinguishable from the case at bar.

In *L. Ray Packing Co. v. Commercial Union Ins. Co.*, 469 A.2d 832 (Me. 1983), the Supreme Judicial Court of Maine held that "loss of profits" did not fall within the property damage language in a liability policy with provisions not dissimilar to those in the instant case. *Id*. at 835-36. The court in *L. Ray* noted that the underlying suit was an antitrust action brought under the federal Clayton Act. *Id*. at 835. The court relied on a case from the United States Supreme Court and noted that it was "compelling authority that antitrust actions do not allege property damage." *Id*. (citing *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 51 L.Ed. 241, 27 S.Ct. 65 (1906)). The holding in *L. Ray* is not implicated by the facts of the instant case.

In *Liberty Bank of Mont. v. Travelers Indem. Co.*, 870 F.2d 1504 (9th Cir. 1989), the United States Court of Appeals for the Ninth Circuit, applying Montana law, addressed a coverage issue under a policy with "property damage" provisions functionally identical to those in the case at bar. *Id*. at 1508. In *Liberty Bank*, the plaintiff had been sued in the underlying litigation for conduct which allegedly "'denied [the claimants] their right to claim a security interest' against the increase in the value of the inventory." *Id*. The claimants had charged that they invested money in one of the bank's customer based upon the bank's commitment that, if the claimants invested additional money in the customer who was then in default to the bank, "the bank would subordinate its security position in the inventory and accounts receivable to the extent that they appreciated in value after September 1, 1981." *Id*. at 1505. When the bank "repudiated its subordination agreement" and foreclosed its security interest to the detriment of the claimants, they successfully sued the bank. *Id*.

The plaintiff in *Liberty Bank* sued its insurance company on the theory that the claimants' claim in the underlying action fell within the property damage coverage of the plaintiff's liability policy with the defendant. *Id*. at 1505. The court in *Liberty Bank* held that the claim for which coverage was being sought did not involve a loss of use of tangible property. *Id*. at 1509.

While *Liberty Bank* is similar to the case at bar, there are significant differences which distinguish it from the instant case. First, *Liberty Bank* does not set forth the language of the

-17-

document(s) upon which the claimants relied to sustain their rights in that case. We have the documents in this case and they clearly permit AmSouth to take and utilize the property *in one of a number of ways*. Furthermore, **Liberty Bank** does not attempt to analyze "loss of use" in terms of the usual and ordinary meaning of those words. We do not find this case persuasive authority for Nationwide's position in this case.

Nationwide relies on other cases which we also do not find persuasive. *See USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 617 (W.D. Pa. 2000) (finding no coverage where, in the underlying case, "liability was imposed for the loss of intangible property, i.e., the ability to compete and generate profits, gain investment values and increase productivity"); **Vogel v. Russo**, 613 N.W.2d 177, 179 (Wisc. 2000) (holding that a comprehensive general liability insurance policy with property damage provisions similar to those in the case at bar did not provide "coverage for diminution in value of a home that resulted from [the insured's] faulty masonry work"); **Wisc. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.**, 607 N.W.2d 276, 278 (Wisc. 2000) (holding that there was no "property damage" where the loss involved occurred as a result of the mislabeling of products which in turn "caused the products to be sold at less than half of their intended retail price"). *See also* **Safeco Co. v. Andrews**, 915 F.2d 500 (9th Cir. 1990); **Comm. Union Ins. Co. v. Image Control Prop. Mgmt.**, 918 F. Supp. 1165 (N.D. Ill. 1996); **Fireman's Fund Ins. Co. v. Nat'l Bank for Coops.**, 849 F. Supp. 1347 (N.D. Cal. 1994); **Ticor Title Ins. Co. v. Employers Ins.**, 48 Cal. Rptr. 2d 368 (Cal. Ct. App. 1995); **Standard Fire Ins. Co. v. Chester-O'Donley & Assoc.**, 972 S.W.2d 1 (Tenn. Ct. App. 1998) (decided under Kentucky law). None of these cases involve facts that are similar to the facts in the instant case.

In the instant case, we are dealing with a claim by a third party for a loss that we have found is covered under the applicable policy language as interpreted under well-established precedent. Nationwide's argument pertaining to "economic loss" is a "red herring" in this case. AmSouth's claim was based upon its inability, because of Marlin's negligence, to "use" some of the property it had a right to use under the assigned contract documents. In our judgment, it matters not, under the language of the policy before us, *how* AmSouth was going to *use* the property; what matters is that it had a *right to use* property and that right was lost due to Marlin's negligence. The cited cases are of no help to us in resolving the questions now before us. They simply are not implicated by the facts of the instant case.

C.

Finally, Nationwide argues that the trial court erred in awarding Marlin prejudgment interest of 10%. We disagree.

The decision of whether to award prejudgment interest is within the sound discretion of the trial court and will not be disturbed by an appellate court absent "a manifest and palpable abuse of discretion." **Myint v. Allstate Ins. Co.**, 970 S.W.2d 920, 927 (Tenn. 1998). "A trial court acts within its discretion when it applies the correct legal standard and reaches a decision that is not clearly unreasonable." **Bogan v. Bogan**, 60 S.W.3d 721, 733 (Tenn. 2001). In the instant case, the trial court, relying upon the authority of **Myint**, determined that an award of prejudgment interest was necessary in order to fully compensate Marlin "for the loss of the use of funds to which it was legally

-18-

entitled." We cannot say that this decision was "clearly unreasonable." *See **Bogan***, 60 S.W.3d at 733. We find no abuse of discretion in the trial court's award of prejudgment interest.

D.

Marlin contends that the trial court erred in failing to find that Nationwide was guilty of bad faith in its handling of Marlin's claim. We disagree.

Tenn. Code Ann. § 56-7-105(a) provides the following:

> The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Before a plaintiff may recover a penalty pursuant to this provision,

> (1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith.

***Palmer v. Nationwide Mut. Fire Ins. Co.***, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986); ***Walker v. Tennessee Farmers Mut. Ins. Co.***, 568 S.W.2d 103, 106 (Tenn. Ct. App. 1977). The plaintiff has the burden of proving the insurer's bad faith. ***Palmer***, 723 S.W.2d at 126.

The trial court found that "[g]iven all of the facts and circumstances of this case," there were "legitimate ground[s] for disagreement about the coverage of the insurance policy and that Nationwide should not be burdened with the statutory penalty." The imposition of a statutory penalty upon an insurer is discretionary with the trial court and, absent an abuse of that discretion, will not be disturbed on appeal. ***Daugherty v. Stuyvesant Ins. Co.***, 169 Tenn. 300, 86 S.W.2d 1095,

-19-

1096 (1935). After reviewing the record, we cannot say that the trial court abused its discretion in refusing to impose the bad faith penalty.

V.

The judgment of the trial court is affirmed. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Nationwide Mutual Insurance Company.

_____
CHARLES D. SUSANO, JR., JUDGE